UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| SANDY BERGESON, | ) | CIV. 04-5053-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE |
| | ) | COMMISSIONER'S DECISION |
| JO ANNE B. BARNHART, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Sandy Bergeson, moves the court for a reversal of the Commissioner of Social Security's decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Defendant opposes the motion. The court affirms the Commissioner's decision denying benefits.

**FACTS**

Bergeson was born December 12, 1956. She completed high school and a legal secretary certificate program. Bergeson is married and separated from her husband. She currently resides in Kadoka, South Dakota, with her two adopted daughters.

Bergeson had a steady work history, with occasionally fluctuating income, from the early 1970s until her alleged onset date of November 16, 1997. Bergeson worked as a legal secretary from 1982 through 1987, a court

clerk from 1987 through 1989, a home visitor for a Head Start program from 1991 to 1993, a retail clothing clerk from 1994 to 1995, a motel desk clerk from 1997 to 1998, and a motel maid from 1999 through 2000.  At the time of the hearing, Bergeson had been employed for over a year as a part-time secretary (24 hours per week) for the Women, Infants, and Children (WIC) program.

Bergeson's medical history begins in 1972.  Bergeson was seen in clinics in Kadoka, South Dakota, by Drs. B.O. Lindblom, Lowell P. Swisher, and G.J. Mangulies from 1972 through mid-1990 for a variety of complaints.  Many of Bergeson's appointments in the 1980s dealt with gynecological problems, recurring headaches, and anxiety symptoms.

On March 15, 1990, Dr. Dave Johnson saw Bergeson for complaints of light-headedness, headache, fatigue, and anxiety.  Dr. Johnson also noted the recent onset of hypertension and that Bergeson displayed morbid obesity. Dr. Johnson suggested additional testing, offered advice on breathing techniques, and suggested a reduced-calorie diet.  On April 12, 1990, Dr. Steven Hata reviewed Bergeson's complaints of light-headedness, headaches, racing pulse, hyperventilation, and tingling in her extremities.  Dr. Hata recommended additional testing to rule out an inner ear imbalance or other problems and advised Bergeson about techniques to slow her breathing.  (Tr. 152-155).  Bergeson was seen an additional seven times by Dr. Johnson

through September 7, 1990.  These examinations discussed her previous complaints and the testing results determined the complaints to be of unknown etiology.  Bergeson indicated she had not tried the hyperventilation breathing technique.  (Tr. 158-177).  Bergeson was also seen by Dr. Mary Carpenter 10 times from June 1990 through December 1990.  Bergeson came in for blood pressure checks, refills, and noted her usual anxiety symptoms in addition to diarrhea on one occasion.  (Tr. 196).

Dr. Hata saw Bergeson on September 20, 1990 for a neurological examination related to her reported anxiety.  Dr. Hata noted no abnormal readings from Holter monitor, EKG, CAT scan, or EEG.  Dr. Hata indicated that Bergeson reported great improvement in her anxiety symptoms with regular exercise.  (Tr. 150-51).

Dr. Carpenter saw Bergeson on March 18, 1991 for complaints of dizziness and tingling in her extremities.  Dr. Carpenter suggested a repeat of earlier testing to rule out cardiac or sleep problems, but if the testing came back normal, Bergeson should consider a psychological consultation.  (Tr. 181-187).  On May 21, 1991, Bergeson's gynecologist noted her complaints of anxiety and dizziness during her annual exam and reported to her that her symptoms were not caused by a hormonal imbalance.  (Tr. 214).  On September 30, 1991, Dr. T. Berg saw Bergeson and diagnosed chest pain of unknown origin.  (Tr. 198).

On December 20 1991, Bergeson was seen at the Mayo Clinic for a full evaluation of her symptoms.  Dr. Richard J. Pisani diagnosed anxiety and panic attacks and prescribed medication changes to address this issue while accommodating Bergeson's hypertension.  Dr. Pisani increased antidepression medication and prescribed sleeping pills if the initial changes did not alleviate Bergeson's symptoms.  (Tr. 188).  Dr. Carpenter saw Bergeson 18 times in 1991 for a variety of complaints, blood pressure checks, and refills.  On three occasions, Bergeson complained of anxiety symptoms including dizziness.  (Tr. 196-98).

Dr. Carpenter saw Bergeson 31 times in 1992 and 1993 for a variety of complaints, blood pressure checks, and refills.  (Tr. 192-94). On one occasion, Bergeson complained of suffering a panic attack during a car trip to Pierre, South Dakota.  Id.

Dr. Carpenter saw Bergeson 26 times from 1994 to 1998, mostly for refills.  On one occasion, Bergeson complained of weak, shaky spells.  (Tr. 191).

On August 14, 1998, Dr. C.C. Klopper saw Bergeson at the emergency room in Philip, South Dakota, for an anxiety attack.  Dr. Klopper discussed Bergeson's symptoms of chest tightness, difficulty breathing, and accelerated heart rate and adjusted Bergeson's anxiety medication and advised her to exercise and lose weight.  (Tr. 205-08).

4

During 1999, Bergeson was seen 18 times at the Philip Health Services Clinic for a variety of complaints.  Bergeson was primarily seen for regular exams or sinus problems and pneumonia on one occasion.  At two appointments during 1999, Bergeson described her anxiety symptoms.  In July 1999, Bergeson was referred to counseling and received increased dosage prescriptions for her anti-depressant.  In November 1999, Bergeson described herself as blue, restless, and distracted, but also described sleeping well and feeling fulfilled as a wife and mother.  (Tr. 243-47).

During 2000 and 2001, Bergeson was seen 24 times at the Philip Health Services Clinic for a variety of complaints.  The complaints included sinus problems, rosacea, refills, back pain, and blood pressure checks.  On one occasion in August, Bergeson complained of increased nervousness and anxiety.  Dr. Dave A. Holman adjusted her medication, advised Bergeson about general anxiety, and encouraged her to come in if any problems arose.  (Tr. 239-43).  In September 2001 Bergeson's anxiety was described as stable and well controlled with medication.  In October 2001, Bergeson described some generalized anxiety that she attributed to not feeling well.  Bergeson also denied depression or panic attacks at this appointment.  (Tr. 237-239).

On July 18, 2001, Lynn Goehring, a licensed psychologist, did a psychological evaluation on Bergeson for Disability Determination Services. Bergeson described her symptoms and history of panic attacks since 1990.

5

Bergeson said since that time, her activities and social life had been extremely limited. Bergeson described household chores that previously had been simple seemed difficult tasks now. Bergeson noted she does the family finances, but that it takes her longer than it used too. Bergeson denied marital problems, but also noted that her husband ignores her panic attacks and allows Bergeson to deal with them alone. Bergeson described her past work as a bankruptcy clerk and her feelings of inadequacy due to her current employment as a motel maid. Goehring reported that Bergeson had average intellectual capability and superior memory skills. Goehring indicated a belief that Bergeson's emotional problems would be significantly reduced if she were to be employed in an enjoyable job. (Tr. 215-19).

On July 31, 2001, Dr. Phillip E. Hoffsten conducted a physical examination of Bergeson for Disability Determination Services. Bergeson reiterated the symptoms of her panic attacks and noted they occur once or twice a week and last from minutes to hours in length. Dr. Hoffsten noted that Bergeson was morbidly obese. Dr. Hoffsten indicated that Bergeson's ability to lift, carry, stand, walk, or sit during an 8-hour workday would be "significantly compromised" by her obesity, but that in all other regards, Bergeson was as employable as any member of the general public. Dr. Hoffsten opined that Bergeson's obesity, diabetes, and hypertension might eventually lead to significant health problems in the future. (Tr. 220-222).

On August 24, 2001, Cheryl P. Buchkoski completed a Psychiatric Review Technique form for Bergeson.  Buchkoski determined that Bergeson did not meet the listing requirement for § 12.04 Affective Disorders because her alleged impairments, panic attacks, and hyperfocusing on her health issues, were not severe impairments.  Buchkoski found Bergeson to have only mild limitations on social functioning and maintaining concentration, persistence, and pace, and no episodes of decompensation.  (Tr. 223-236).

On October 20, 2001, Daniel Mennally completed a Psychiatric Review Technique form for Bergeson.  Mennally determined that Bergeson did not meet the listing requirement for § 12.06 Anxiety-Related Disorders because although she had anxiety attacks, they were not to the degree required to meet this listing.  Mennally noted that Bergeson dwells upon her health, denied depression or panic attacks, and reported a good response to medication. Mennally found Bergeson to have only mild limitations on daily living, social functioning, and maintaining concentration, persistence, and pace, and no episodes of decompensation.  (Tr. 262-275).

On February 8, 2002, Bergeson was seen for chest pain.  Dr. David Holman reported that Bergeson's anxiety and panic attacks were well controlled.  Dr. Holman ruled out cardiac problems, but encouraged Bergeson to continue exercising and controlling her blood sugar.  (Tr. 289).  Dr. Holman or nurse practitioner Robin Peterson-Lund saw Bergeson 8 additional times

7

between February 2002 and August 2002.  Most appointments discussed fluctuations in Bergeson's control of her diabetes and hypertension.  At the last appointment in August 2002, Bergeson informed Peterson-Lund, that Bergeson was separated from her husband, but that this development had not made her overly depressed.  (Tr. 285-87).

On September 4, 2002, Peterson-Lund reported that Bergeson had been under frequent treatment for anxiety, panic attacks, diabetes, hypertension, and hyperlipidemia.  (Tr. 276).[1]  Bergeson was also seen an additional three times by Peterson-Lund in September 2002.  Bergeson was seen for management of her diabetes, hypertension, and hyperlipidemia.  Bergeson was advised on potential cholesterol lowering medication and encouraged to renew her efforts at exercise and diet, but Bergeson refused hyperlipidemia medications.  Bergeson mentioned she gets panic attacks when she drives alone.  (Tr. 284-85).

On October 31, 2002, neuropsychologist James C. Gardiner conducted a psychological evaluation of Bergeson upon request of the ALJ.  Gardiner reported that Bergeson had serious panic and anxiety disorders which resulted in her being an inconsistent and unreliable employee.  Gardiner noted that although Bergeson had good intelligence and other cognitive skills, that

_____

[1] Peterson-Lund also wrote a similar letter on March 11, 2003 outlining Bergeson's history of panic and anxiety disorder.  (Tr. 303).

8

Bergeson was unable to access these skills at times due to her disorder. Gardiner indicated that Bergeson's current part-time employment was only possible because of an accommodating supervisor. Gardiner opined that Bergeson's disorder would impact her as a homemaker and full-time employment would only be possible with an accommodating employer. Gardiner recommended individual and group psychotherapy to deal with her panic and anxiety disorders. (Tr. 277-81).

On November 7, 2002, Gardiner also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) form. Gardiner marked all of Bergeson's abilities as good on days when she is not having anxiety problems, but marked all abilities at occupational and performance adjustments as poor when Bergeson was suffering from anxiety attacks, which could be as often as several times daily to as infrequently as several times monthly. Gardiner indicated under personal and social adjustments that Bergeson could maintain her personal appearance, but that Bergeson had poor abilities in emotional stability, predictability, and reliability because of her unpredictable anxiety attacks. (Tr. 282-83).

Bergeson was seen 8 times from October 2002 through February 8, 2003, at the Philip Health Services Clinic for medication checks and refills. (Tr. 322). On February 11, 2003, Bergeson reported no recent panic attacks and Peterson-Lund reported that Bergeson was cheerful. Bergeson also

9

reported she was not exercising.  (Tr. 322-23).  Peterson-Lund saw Bergeson on February 26, 2003 and advised Bergeson to attend classes for better management of diabetes.  Lund also noted that Gardiner's recent evaluation indicated a "general sense of depression" and advised Bergeson to attend psychotherapy.  (Tr. 324-25).  Bergeson was seen at the Philip Health Services Clinic an additional 17 times from March through September 2003.  These appointments were for refills, follow-up on her medical conditions, a cold, back pain, suspected food poisoning, and review of potential surgery for obesity.  (Tr. 326-337).

At the time of the hearing on September 11, 2002, Bergeson was 46 years old.  Bergeson informed the court that despite a recent weight loss, she had been overweight her entire life.  Bergeson stated she felt she was unemployable because of her panic and anxiety attacks and the accompanying symptoms of fatigue and nervousness.  Bergeson testified that although she works part-time for the WIC program, that her panic attacks randomly strike, with the last one occurring at work a couple of weeks ago.  Bergeson said when she has a panic attack, she can't breathe, has chest pain, gets chills and sweats, and has a general feeling that she is going to die.  Bergeson stated these attacks last anywhere from a few minutes to several hours, with the last one lasting a half hour.

Bergeson testified it helped to go for a 15-20 minute walk to calm herself when an attack happened.  Bergeson says she also has the attacks at home in the evenings and the symptoms are the same.  Bergeson noted her last attack at home had lasted 3 hours.  Bergeson stated she takes medication for her attacks and that the medication helps and she experiences tolerable side effects.  Bergeson indicated her blood pressure was well-controlled with medication, but she struggled with medical management of her blood sugar levels related to her diabetes.  Bergeson testified she was unsure of whether her panic attacks were related to her other medical conditions, but that something about the conditions or the medications made her feel fatigued all the time.

Bergeson said she could not be a motel desk clerk any more because dealing with the public, especially when they were irate, was too stressful and that she could not be a motel maid, because she worked alone and the fear of loneliness brought on panic attacks.  Bergeson also noted that she cannot drive alone, because that triggers panic attacks as well.  Bergeson listed her past work as a retail clerk and as a WIC clerk as jobs that she didn't know if she could cope with as full-time work.  Bergeson stated that when she got off work at the WIC office on Thursday, that she was usually "shot" and went home to care for her kids and take  walks.  Bergeson also stated that she cleaned house on Fridays.  She claims she could not do the Head Start work

because of the stress of classroom time and that the other part of her job involved a lot of travel to people's homes and she was unable to drive alone.

Bergeson said she stopped working full-time when the panic attacks started soon after her marriage and the death of her father.  Bergeson noted she had difficulty concentrating on reading whereas before she used to read a lot.  Bergeson stated she does housework such as cooking, making beds, laundry, and some yard work, but she can be completely interrupted in her efforts if a panic attack strikes.  Bergeson noted that she usually walks several miles daily.  Bergeson indicated that if she tries to go a different route than her usual route, she starts to get an anxiety attack.  Bergeson stated she sometimes gets anxiety attacks even on her usual route, but usually walking relieves her symptoms.  Bergeson stated she does help sometimes with pet care.

Bergeson noted that she sometimes was hesitant to leave her house, but was always able to force herself to leave.  Bergeson stated she had attended counseling in the past, but can no longer drive to the locations where the counselors practice.  Bergeson stated her panic attacks had not improved on medication, but her coping skills had improved.

Bergeson discussed her physical abilities and indicated she could occasionally lift a 50-pound bag of dog food.  Bergeson stated that sitting did not cause her physical problems, but it made her anxious to "just sit and do

12

nothing."  Bergeson noted she can stand for a half hour before her upper legs go numb.

Bergeson described her panic attacks as random, at times happening anywhere from three days in a row to several times weekly and at times going up to two or three months without an attack.  Bergeson stated that after some attacks she has lingering shakiness and nausea that can last for several days. The ALJ allowed two weeks for Bergeson to update the record with her most recent medical records.

Next, the vocational expert (VE) Warren Haagenson testified.  The VE stated that if Bergeson were fully believable, she would be unable to perform any of her past work because of the stress.  The ALJ asked if a person of Bergeson's age, education, and past work experience with the limitations noted by Dr. Daniel Mennally on November 20, 2001, could perform any of Bergeson's past work.  The VE noted that because Dr. Mennally opined that such a person had mild limitations, such an individual could perform Bergeson's past work.  For a third hypothetical, the ALJ asked the VE to consider the same individual described in hypothetical two, but with moderate restrictions on social functioning, daily activities, or concentration, persistence, and pace.  The VE opined that such a person would be excluded from Bergeson's past skilled work, such as legal secretary or Head Start instructor, but that she could perform the work of a desk clerk with 144,000 positions in

13

the national economy and retail sales clerk or cashier, with 4 million positions in the national economy.  The VE testified that the person in the third hypothetical could perform a full range of unskilled work.  The ALJ asked if any of the hypothetical individuals could perform any of Bergeson's past work if the person was subject to several anxiety attacks per week, requiring unscheduled breaks for up to a half hour.  The VE testified that such a person would likely not be employable.

The ALJ allowed Bergeson to question the VE and after some discussion regarding the existing psychological evaluations, the ALJ recommended a further psychological assessment by Dr. James Gardiner which was supplemented to the record post-hearing.  (Tr. 348-406, 277-83).

## ALJ DECISION

Bergeson filed an application for supplemental security income (SSI) and disability insurance benefits (DIB) under Titles II and XVI of the Act on January 12, 2001.  Bergeson alleged an onset date of November 16, 1997. Bergeson's claim for benefits was disapproved initially and on reconsideration. Bergeson untimely requested a hearing before an ALJ, but was found to have good cause for the delay.  Pursuant to her request, a hearing before an ALJ was held on September 11, 2002.  The ALJ issued an unfavorable decision on July 17, 2003, and Bergeson requested review by the Appeals Council.  The

Appeals Council declined Bergeson's request for review on May 13, 2004, and Bergeson filed the present appeal on July 1, 2004.

After applying the sequential five-step evaluation process,[2] the ALJ concluded that Bergeson was not entitled to benefits.  First, the ALJ determined that Bergeson had last engaged in substantial gainful activity on August 27, 1998.  Second, the ALJ found that Bergeson suffered from medically determinable impairment of anxiety-related disorders and that the impairment was severe.  The ALJ also found that Bergeson had the following non-severe medical conditions: hypertension, diabetes mellitus, and obesity.  Third, the ALJ found these impairments, either individually or in combination, did not meet or equal the Listing of Impairments at 20 C.F.R. Pt. 404, Subpt. P, appendix 1.  The ALJ noted that no physician opined regarding the listing-level severity of Bergeson's impairments.

---

[2]The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

Fourth, the ALJ determined Bergeson's residual functional capacity by reviewing medical records and testimony of witnesses.  The ALJ found that the medical evidence supported the above listed severe and non-severe impairments, but that Bergeson was not otherwise credible and her alleged symptoms from the impairments exceeded those expected from such impairments.

The ALJ summarized Bergeson's self-reported limitations.  The ALJ noted that despite her described panic attacks and related symptoms, Bergeson was working part time, had not sought psychological treatment for years, and was not subject to physician limitations.  The ALJ stated that at most, Bergeson's physicians suggested she needed to exercise more to deal with stress.

The ALJ detailed Bergeson's significant daily activities.  The ALJ stated that Bergeson completes household chores, cooks, washes laundry, attends church, walks several miles daily, attends her children's activities locally, uses a computer, cares for pets, shops, goes to movies, goes out to eat, keeps track of her checking account and bills, makes lists to help her recall activities, and works part time.

The ALJ also considered Bergeson's testimony that she could not work at jobs which required contact with others because it was too stressful, but that she could also not work alone because that brought on anxiety attacks.  The ALJ noted that Bergeson's recent work record supported her credibility, but

that was undermined by the fact that she had never attempted full-time work that wasn't skilled or semi-skilled.  The ALJ emphasized that Bergeson stated her ability to deal with panic symptoms was improved with medication and that Bergeson never testified she had to abandon a work shift because of anxiety.  In addition, the ALJ noted that while working a part-time semi-skilled job, that Bergeson was able to go home after work to cook and spent the day after her workweek concluded cleaning house.  The ALJ concluded that Bergeson's testimony regarding the severity of her symptoms was undermined by her self-reported daily activities.

The ALJ next analyzed the medical evidence.  The ALJ noted that Bergeson was not subject to any physician limitations.  The ALJ also highlighted records that indicated Bergeson's anxiety was greatly reduced with regular exercise.  The ALJ noted the medical record was full of notations for refills, but that Bergeson infrequently sought assistance with increased anxiety episodes and often described her anxiety symptoms as stable or under control. The ALJ also described a period of time from fall 2000 to fall 2001 where Bergeson sought no specific anxiety treatment other than refills.

The ALJ discussed specific psychological evaluations.  The ALJ noted Dr. Goehring's conclusions of July 18, 2001, that Bergeson was preoccupied with her physical health and panic attacks and that she appeared to be bored and unchallenged in her home environment.  Bergeson's treating physician

during 2002 reported that Bergeson's symptoms were well controlled with medication and that she described doing well, even during a separation from her husband. The ALJ noted that these reports were in contradiction with Bergeson's self-described symptoms and limitations.

The ALJ addressed the conflicting report of consulting physician Dr. Gardiner issued post-hearing on October 31, 2002. Dr. Gardiner concluded that when Bergeson's anxiety attacks occur, her emotional stability, predictability, and reliability deteriorated significantly. Dr. Gardiner stated that these behaviors were challenging because the random nature of her severe anxiety attacks made her unemployable. Although Bergeson similarly described herself as incapacitated for up to 24 hours after an anxiety attack, no treating physician ever observed or received a report of such debilitation from Bergeson. The ALJ found the reports of Dr. Gardiner inconsistent with the record as a whole and the reports of all other treating or consulting physicians.

The ALJ found that Bergeson's anxiety causes some mild or moderate limitation on her daily living, social functioning, or concentration, persistence, and pace, which may inhibit her skilled work abilities. After reviewing Bergeson's past relevant work, the ALJ concluded that Bergeson could perform her past relevant semi-skilled work as a motel desk clerk or a retail sales clerk. The ALJ also concluded that Bergeson could perform the full range of unskilled

18

work.  The ALJ concluded at Step Four that, based on the record as a whole,
Bergeson was not disabled under the Social Security Act.  (Tr. 21-33).

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial
evidence in the record as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d
374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance
but enough evidence that a reasonable mind might find it adequate to support
the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v.
Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389,
401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court
extends beyond a limited search for the existence of evidence supporting the
Commissioner's decision to include giving consideration to evidence in the
record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d
1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir.
1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is
substantial evidence in the record as a whole to support the decision of the
Commissioner and not to reweigh the evidence or try the issues de novo.
Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a
reviewing court may not reverse the Commissioner's decision "merely because
substantial evidence would have supported an opposite decision."  Woolf v.

Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  See also Smith v. Shalala, 987 F.2d

at 1374.  The court must review the Commissioner's decision to determine if an

error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir.

1992); Nettles v. Schweiker, 714 F.2d 833, 836 (8th Cir. 1983).  The

Commissioner's conclusions of law are only persuasive, not binding, on the

reviewing court.  Smith v. Sullivan, 982 F.2d at 311; Satterfield v. Mathews,

483 F. Supp. 20, 22 (E.D. Ark. 1979), aff'd per curiam, 615 F.2d 1288, 1289

(8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then

this court cannot reverse the decision of the ALJ even if the court would have

decided it differently.  Smith v. Shalala, 987 F.2d at 1374.

**DISCUSSION**

**1.    Consulting Physician**

The ALJ should give more weight to the opinion of doctors who have

treated the claimant regularly for years or months because they have a better

understanding of the impairment.  Shontos v. Barnhart, 328 F.3d 418, 426 (8th

Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)).  The opinion of a consulting

physician who examines the claimant once or not at all does not generally

constitute substantial evidence.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.

1998).  It is within the ALJ's discretion to resolve conflicts between a

consulting physician and a treating physician.  Cantrell v. Apfel, 231 F.3d

1104, 1107 (8th Cir. 2000).

20

Here, the ALJ specifically noted that despite Dr. Gardiner's dire predictions of Bergeson's employability, that none of Bergeson's treating physicians had ever placed any work restrictions on her and that Dr. Gardiner was a one-time consulting physician.  Because a consulting physician's opinion is not substantial evidence, particularly where it conflicts with the record as a whole, the ALJ properly resolved the conflict between a consulting physician and the balance of the record with a finding of no disability.

**2.    Credibility Determination**

Bergeson alleges the ALJ erred in finding her testimony not fully credible.  The court's "touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).  When evaluating a claimant's credibility relating to nonexertional complaints, the ALJ must consider all evidence regarding the claimant's subjective complaints, including:

> the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; [and] 5. functional restrictions.

Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  In addition, the ALJ may consider a lack of physician-imposed work limitations.  Tennant v. Apfel, 224 F.3d 869, 870-71 (8th Cir. 2000).  The court should defer to the ALJ so long as he cites

reasons for discrediting a claimant's testimony.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).

Bergeson claimed constant pain and limitation, which, if true, would prevent her from doing any type of work.  Several of the Polaski factors, however, weigh against Bergeson's pain allegations.  Bergeson indicated that she was able to work part time, cook meals, perform household chores, attend church, attend her children's local activities, maintain her finances, walk daily, go to movies and restaurants, shop, and use a computer.  See Hutton v. Apfel, 175 F.3d 651, 655 (8th Cir. 1999) (finding no disability for claimant with similar daily activities).  Furthermore, no treating physician placed total restrictions on Bergeson's activities.  See Hutton, 175 F.3d at 655 (finding lack of physician-imposed work restrictions proper to consider in determining credibility).  To her credit, the ALJ noted that Bergeson had a good work record prior to the alleged onset of her disability, but the ALJ also correctly noted that this finding was overwhelmingly outweighed by the balance of the record.  Id. (noting that while claimant could demonstrate that she suffered some symptoms, her claims of total disability were not supported by the record as a whole).

The remaining Polaski factors weigh against a finding of disability for Bergeson.  Impairments amenable to treatment militate against a finding of disability.  Id.  Failure to follow a prescribed course of treatment also warrants a finding of no disability.  Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

22

Although Bergeson alleges her anxiety prevents her from doing any kind of work, even unskilled simple work, her medical records are replete with statements that she is doing well, her anxiety responses improve significantly with use of medication and exercise, and she declined to engage in active psychotherapy.  The ALJ reviewed all of the <u>Polaski</u> factors and cited reasons why he found that Bergeson was not credible.  This court sees no reason to disturb those findings.

**CONCLUSION**

Substantial evidence of record supports the ALJ's conclusion that Bergeson was not disabled under the Act for any physical or mental impairment or combination of physical or mental impairments.  Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Sandy Bergeson's claim for disability benefits and supplemental security income under Titles II and XVI of the Social Security Act is affirmed.

Dated May 9, 2005.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE